Sandra E. Mayerson, Esq., *pro hac vice* pending
David H. Hartheimer, Esq.
MAYERSON & HARTHEIMER, PLLC
845 Third Ave., 11th floor
New York, NY  10022
646-778-4381

Nicholas F. Kajon, Esq.
STEVENS & LEE
485 Madison Avenue
New York, NY  10022
212-319-8500

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| A&L AUTO REPAIR, Inc.; AUTO WIZ REPAIR SHOP, Inc.; SHAHID M. BHALLI and his operator, CRANBROOK ENTERPRISES, Inc.; OCEAN AVENUE AUTO CENTER, Inc.; PETROLEUM 411 INC., and its operator, ZOOM CAR SPA LLC; SADEEN CORP. f/k/a AA and MM AUTO; and SSJ FRIENDS, LLC, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) Case No. 17-cv-3529 |
| -V- | ) ) |
| HUDSON PETROLEUM REALTY, LLC; CONSOLIDATED PETROLEUM, LLC; and CAPITOL PETROLEUM GROUP, LLC, | ) ) Jury Trial:  _X_ Yes  ____ No ) ) ) |
| Defendants. | ) |

## COMPLAINT AND JURY DEMAND

### I.  STATEMENT OF THE CASE

**1.**  The Petroleum Marketing Practices Act, 15 U.S.C. Section 2801 *et seq.* ("PMPA"), limits the circumstances in which a motor fuel franchisor like Defendants can terminate or choose not to renew a franchise relationship.  Its intent is to protect gas station franchisees like

Plaintiffs from arbitrary termination or nonrenewal of their franchises with large oil corporations and gasoline distributors, and to remedy the disparity in bargaining power between parties to gasoline franchise contracts.  The PMPA is intended to prevent the appropriation and/or forfeiture of hard-earned goodwill which occurs when a franchisor arbitrarily takes over a business that franchisees like Plaintiffs have turned into successful going concerns.

2.  In order to evade the Congressionally-mandated strictures of the PMPA and in wanton disregard thereof, Defendants and Getty Realty (as defined below) orchestrated a scheme to provide Plaintiffs with so-called commission agent agreements that are seemingly outside the scope of the PMPA because Plaintiffs purportedly are not "retailers," and instead are designated under the franchise agreements as "commission agents" who do not take title to and therefore do not "sell" gas to retail customers.  This subterfuge should not be countenanced by this Court because, *inter alia*, Plaintiffs bear virtually all of the entrepreneurial risk under the operative agreements.  Importantly, on information and belief, Defendants are not even licensed to sell gasoline in New York State, and are not in compliance with other mandatory environmental, fire and safety laws and regulations.  Therefore, Plaintiffs have to be "retailers" under the franchise agreements.  At the very least, in order to try to qualify as "retailers" under the franchise agreements, Defendants would first have to admit to millions of violations of New York State law over the course of many years.

3.  Defendants repeatedly violated the PMPA or the New York Motor Fuel Franchises Act, purportedly terminated Plaintiffs' rights under franchise agreements in wanton disregard of the PMPA, breached their implied covenants of good faith and fair dealing with Plaintiffs, fraudulently induced Plaintiffs into entering into the franchise agreements, fraudulently induced Plaintiffs into inaction when Defendants illegally purported to non-renew the franchise

2

agreements, and engaged in other violations of law and misconduct detailed herein.  Defendants'

legal violations and misconduct was the proximate cause of damages suffered by Plaintiffs in an

amount to be established at trial but not less than $10 million, plus attorneys' fees and exemplary

damages on account of Defendants' wanton disregard of the PMPA.

## II.  PARTIES TO THIS CASE

4.  Plaintiff A&L Auto Repair, Inc., is a New York corporation with offices at 1672 86th

St., Brooklyn, NY 11214, where it has operated a gas station for twenty years which currently

employs 6 people ("A&L").

5.  Plaintiff Auto Wiz Repair Shop, Inc., is a New York corporation with offices at

125 Kings Hwy., Brooklyn, NY 11223, where it has operated a gas station for more than twenty

years which typically employs about four people ("Auto Wiz").

6.  Plaintiff Shahid M. Bhalli is an individual with offices at 6418 8th Ave., Brooklyn,

NY 11220, who acquired an assignment of a certain Commission Agent Agreement and Station

Lease with Defendant Hudson Petroleum Realty, LLC, on or about April 1, 2015, pursuant to

which he acquired the right to operate a gas station at 6418 8th Avenue, Brooklyn, NY, which

typically employs three people ("Bhalli").

7.  Plaintiff Cranbrook Enterprises, Inc., is a New York corporation and is the assignee of

the Commission Agent Agreement and Station Lease acquired by Shahid M. Bhalli, and operates

the gas station located at 6418 8th Ave., Brooklyn, NY 11220, which typically employs

three people ("Cranbrook").

8.  Plaintiff Ocean Avenue Auto Center, Inc., is a New York corporation with offices at

2001 Gravesend Neck Rd., Brooklyn, NY 11229, where it has operated a gas station for 23 years

which currently employs five people ("Ocean Avenue").

9.  Plaintiff Petroleum 411 Inc. is a New York corporation with offices at 3513 Atlantic Ave., Brooklyn, NY 11208, which is a party to that certain Commission Agent Agreement and Station Lease with defendant Hudson Petroleum Realty, LLC, pursuant to which it has the right to operate a gas station and car wash at 3513 Atlantic Ave., Brooklyn, NY 11208 ("411").

10.  Plaintiff Zoom Car Spa LLC is a New York limited liability corporation with offices at 3513 Atlantic Ave., Brooklyn, NY 11208, which operates a gas station and car wash for its sister company, Plaintiff 411, at that location for the last 10 years which employs about 20 people ("Zoomcar").

11.  Plaintiff Sadeen Corp. f/k/a AA and MM Auto is a New York corporation with offices at 5801 Flatland Ave., Brooklyn, NY 11234, where it has operated a gas station for ten years which currently employs 5 people ("Sadeen").

12.  Plaintiff SSJ Friends, LLC, is a New York limited liability corporation with offices at 1881 Utica Ave., Brooklyn, NY 11234, where it has operated a gas station for thirteen years which currently employs four people, but employs more people when Defendants are delivering gas and Plaintiff is fully operational ("SSJ").

13.  Defendant Hudson Petroleum Realty, LLC, is a Delaware limited liability company with offices at 6820B Commercial Dr., Springfield, VA 22151 ("Hudson").

14.  Defendant Consolidated Petroleum, LLC, is a Delaware limited liability company which, on information and belief, is a sister corporation to defendant Hudson and which has offices at 6820-B & G Commercial Dr., Springfield, VA 22151 ("Consolidated").

15.  Defendant Capitol Petroleum Group, LLC, is the parent of Defendants Hudson and Consolidated and is a Delaware limited liability company with offices at 6820-B & G Commercial Dr., Springfield, VA 22151 ("Capitol").

4

### III.  JURISDICTION AND VENUE

**16.**  This court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1331, as to Counts I, II, and III, which arise under a federal law and involve a federal question.  Specifically said counts arise pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801 *et seq.* ("PMPA").  Section 2805(a) of the PMPA provides that an action under the PMPA may be brought in the District Court of the United States.

**17.**  This court has pendent jurisdiction over the remaining counts as they are inextricably intertwined with the federal questions.

**18.**  In addition, federal jurisdiction over all counts exists because all non-individual Plaintiffs are organized under the laws of New York State, and maintain their principal place of business in the Eastern District of New York State.  Plaintiff Bhalli is a resident of New York State and conducts his business in the Eastern District of New York State.  All Defendants are organized under the laws of Delaware, and maintain their principal place of business in Virginia. The matter in controversy exceeds the sum or value of $75,000, and is between citizens of New York State and citizens or subjects of a foreign state.  Therefore, pursuant to 28 U.S.C. § 1332, this Court has federal diversity jurisdiction over this action.

**19.**  Venue is proper in this District pursuant to 15 U.S.C. Section 2805(a) which provides that an action pursuant to the PMPA may be brought in the District Court of the United States in any judicial district in which the principal place of business of such franchise is located or in which such franchisee is doing business.  All Plaintiffs are franchisees doing business in the Eastern District of New York.

**20.**  Venue is also proper in this District generally pursuant to 28 U.S.C. § 1391(b)(2).

## IV.  FACTS OF THE CASE

**Original Long-Term Franchise Agreements with Getty**

21.  Most of the Plaintiffs have long-term relationships originating with Getty entities, which were subsequently migrated to other entities, ultimately to Defendants.  However, throughout these migrations, the essential relationships between the station operators and their contract counter-parties remained the same, even though, the counter-parties changed and some contract provisions were modified by the counter-parties, on information and belief, to try to circumvent the PMPA.

22.  On information and belief, in or about 1997, Getty Oil Company, in order to avoid the effects of the PMPA among other reasons, chose to divide its business into two segments: Getty Petroleum Marketing, Inc. ("GPMI"), which was largely the petroleum business, and a real estate company, Getty Properties Corp., which today is a subsidiary of Getty Realty Corp., a publicly traded REIT (Getty Properties Corp. and Getty Realty Corp. referred to hereinafter together as "Getty Realty").  GPMI leased hundreds of gas stations from Getty Realty pursuant to a Master Lease which accounted for approximately 78% of Getty Realty's properties.

23.  Each leased gas station in the Getty family received two contracts: a lease for the station premises from GPMI called a Retail Gasoline Station Lease Agreement (the "Getty Leases"), and a Lessee Commission Contract from GPMI (the "Getty Commission Contract"). The former governed the terms of the actual lease of the real estate.  The latter governed the terms of the petroleum sales.  The two agreements were tied together by their terms and were co-terminus.  Each of Plaintiffs A&L, Auto Wiz, Ocean Avenue, 411, Sadeen and SSJ (together, the "Long-Term Station Operators") received a Getty Lease and a Getty Commission Contract in substantially the same form.

6

24.   Although the Getty Leases and Getty Commission Contracts show that each of the Long-Term Station Operators was designated as an independent businessman and had full responsibility and risk of running a gas station, GPMI nonetheless created the legal fiction that the gas station operators were not actually buying and selling gas from GPMI.  Rather, the form of the agreements purported to say that GPMI was selling the gas on premises leased by the Plaintiffs, and that Plaintiffs were merely allowing GPMI to do so for a commission.  This was a clear attempt to avoid the effects of the PMPA which governs the relationship between a distributor of gas like GPMI and a retailer of gas like a gas station operator such as the Plaintiffs.

25.   On information and belief, in or about 2000, Getty sold GPMI to Lukoil Americas Corp., a subsidiary of OAO Lukoil ("Lukoil").  Lukoil, through GPMI, entered into a master lease with Getty Realty for 78% of Getty Realty's properties, including the gas stations currently operated by Plaintiffs.  The master lease had renewal options through 2049.  From the viewpoint of the gas station operators, the sale was relatively seamless.  They continued to do business with GPMI, and the Getty Leases and Getty Commission Contracts stayed in place and were routinely renewed.

26.   Despite the legal fiction which GPMI attempted to create in its contracts, the same form of Getty Leases and Getty Commission Contracts received by the Plaintiffs have been acknowledged to create a franchise/franchisee relationship under the PMPA or have been adjudicated pursuant to the PMPA.  The Courts did not uphold Getty's attempt to elevate form over substance.

27.   GPMI had a substantial rent obligation to Getty Realty each month, and had only the petroleum business to rely upon.  Over time, this arrangement took a toll on GPMI.  On information and belief, in late 2010 and early 2011, Lukoil negotiated with Getty Realty to take

7

back certain of the underperforming gas stations and remove them from the Master Lease.  On information and belief, Getty Realty agreed to take back approximately 100 stations, but later declined to implement the agreement.

**28.**  On or about February 28, 2011, GPMI was sold to Cambridge Petroleum Holding, Inc.  Again, the sale was seamless from the station operators' point of view, except they noted that GPMI became increasingly difficult to deal with.

**29.**  On December 5, 2011, GPMI and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Case Number 11-15606 (SCC).  Thereafter, it was alleged that Lukoil stripped GPMI of its most valuable assets, which claim was settled for $93 million in GPMI's bankruptcy.

**30.**  On or about April 30, 2012, the Bankruptcy Court entered an order effectuating GPMI's rejection of its Master Lease with Getty Realty, effectively leaving the Long-Term Station Operators with no lessor.

**31.**  Most of the gas station operators leasing stations from GPMI had given significant security deposits to Getty Realty and/or GPMI for motor fuel.  It was alleged during the bankruptcy, without documentation, that all of these deposits were held by GPMI at the commencement of the bankruptcy, a fact of which the Long Term Station Operators were unaware.  All of the gas station operators who leased stations from GPMI lost huge security deposits, including all of the Long-Term Station Operators, who lost a total of approximately $290,000, even though, the deposits should have been kept in a segregated account for the benefit of the Long-Term Station Operators.

**Defendants' and Getty Realty's Misrepresentations Concerning Long-Term Franchise Agreements**

32.  After rejection of the Master Lease, Getty Realty and Hudson embarked on a course of conduct whereby they made a series of deliberate misrepresentations to fraudulently induce the Plaintiffs to (i) enter into franchise agreements which they were told would be effective for twenty-five years, and (ii) invest large amounts of time and money into improving their stations and increasing their value.

33.  In spring 2012, upon the rejection of the Master Lease, Getty Realty held an open meeting with station operators in the area and assured the station operators that there would be no changes, and that their operations would continue as they had in the past.  David Driscoll of Getty Realty outlined a plan where Getty would enter into a new master lease with a new intermediary who would operate the gas stations the same as GPMI had done, and assured the station operators they would be in their stations for a long time.  The Joint Motion of the Debtors, the Committee, and Getty Properties for Clarification of the Order Rejecting the Master Lease, filed July 13, 2012, Doc #595, at paragraph 20 disclosed:  "Specifically, Getty Properties offered the operators, in exchange for a monthly fee, a temporary license to continue to use the premises on a month-to-month basis *to sell gasoline* until they entered into a longer-term arrangement with a new lease intermediary and gasoline supplier, to be selected by Getty Properties as the replacement for the Debtors."  (Emphasis added).

34.  About 640 station operators across twelve states accepted Getty Realty's offer, including the Long-Term Station Operators.

35.  In keeping with its promises made at the spring 2012 meeting of station operators, Getty eventually brought in the Alliance Energy retail division of Global Partners LP ("Global") as an intermediary.  On information and belief, Global was operating under a month-to-month

master lease.  From the perspective of the Long-Term Station Owners, there was no change. They continued to operate under all of the same terms and conditions as they always had.

36.  In or about January 2013, Getty Realty announced to many of the former Getty station owners, including all of the Long-Term Station Owners, that it would no longer be leasing some of the stations to Global, but rather had entered into a new Master Lease with Capitol.

37.  At a meeting of the Petroleum Dealers Group, Inc., a trade association of about 400 stations in the Northeast which had been Getty stations (the "Dealers Group"), held in or about January 2013 at a Marriott hotel in downtown Brooklyn, representatives of Getty Realty assured the Long-Term Station Operators and other station lessees that Capitol was coming aboard for the long-term, would be an excellent partner for them, and wanted to invest in the stations.

38.  Representatives of Getty Realty, including John Demonty and Joe Portee, assured the station lessees present, including the Long-Term Station Operators, that none of the station operators would lose their stations, and that Capitol, through its subsidiaries, including Hudson, was getting a Long-Term master lease for 25 years to incentivize it to invest in the stations and be a good partner to the station operators.

39.  Getty Realty subsequently disclosed in its 10-K for fiscal 2013 that it had leased 97 stations to Capitol, which were divided among four different Capitol subsidiaries.  The 10-K disclosed that 24 were leased to Hudson.  All of the Plaintiffs' stations are included in the 24 properties leased to Hudson.  The 10-K disclosed that the Master Lease with Capitol and its subsidiary Hudson was for an initial term of 15 years with options for successive renewals of up

10

to another 20 years.  This information was readily available to, and relied upon by, the Long-Term Station Operators.

40.  Representatives of Capitol and Hudson also attended the January 2013 meeting and represented that they would be there for the station operators for the next 25 years.  Among the Capitol and Hudson representatives in attendance were Ed Grisetti, Victor Iroh, Joseph Vaccaro, Monty Berhane and Raj Jayantil.  During the meeting, a senior executive of both Hudson and Capitol, Terry Fitzgerald, spoke and assured the Long-Term Station Owners that Hudson and Capitol were "here for the long haul."  Hudson and Capitol represented that they would be investing in the stations to upgrade them and expected to make a lot of money together with the Long-Term Station Operators over the 25 years ahead.

41.  Getty Realty and Capitol also announced at that meeting that, although their contracts require a substantial security deposit for the petroleum products, because the station operators had already lost substantial deposits in the GPMI bankruptcy, Getty Realty had negotiated with Capitol not to require a huge additional new deposit.

42.  Thereafter, Capitol and Hudson took over on a month-to-month basis.  Once again, the arrival of Hudson was fairly seamless for the station operators.  In many cases, they had to change the branded name of the petroleum products they were selling, but otherwise operations remained the same as they had under GPMI, Getty Realty, and Global.

43.  From the Plaintiffs' point of view, Hudson, Consolidated, Capitol, and their affiliates, operated interchangeably.  Communications to the station operators were sometimes signed by representatives of Hudson, sometimes Capitol, and sometimes Consolidated.  If station operators had a problem, sometimes they dealt with Capitol, sometimes Consolidated and, very rarely, Hudson.  Replies could come from emails from any of the three.  Gas deliveries

11

sometimes came from Consolidated, Hudson, Capitol, and sometimes from an altogether different subsidiary.  Capitol is providing all of Hudson's administrative services, including without limitation, accounting, inventory and billing.  Capitol also arranges for all fuel deliveries to the stations operated by Plaintiffs.  Whenever one of the Plaintiffs has a concern or complaint, they are usually directed to a representative of Capitol.  All day to day dealings are with Capitol personnel.  None of the Plaintiffs has met a Hudson employee.  It was never clear whether the station operators were dealing with Hudson, its sister company Consolidated, or its parent Capitol.  In their dealings with Plaintiffs, all three Defendants operated as one all-encompassing entity, and all actions ascribed herein to Defendants are attributable to Hudson, Consolidated and Capitol acting in concert.

**44.**  In late summer/early fall of 2013, all of the Long-Term Station Operators were informed that Hudson no longer wanted to operate on a month-to-month basis.  Each Long-Term Station Operator was required to sign long-term leases (the "Hudson Leases") and Commission Agent Agreements (the "Hudson Agent Agreements") with Hudson in order to continue the arrangement with Hudson (together, the "Hudson Agreements").  A true and correct copy of the Hudson Agreements is attached hereto as Exhibit A.

**45.**  With one non-substantive exception, there was no negotiation of the Hudson Agreements.  The Long-Term Station Operators were flatly told they could either sign the Hudson Agreements as is, or vacate their stations.  On their face, the Hudson Agent Agreements had a three-year term, while the Hudson Leases were co-terminus with the Hudson Agent Agreements.  Given the previous representations made by Capitol, Hudson and Getty Realty, however, each of the Long-Term Station Operators expected their leases to be renewed

12

automatically at the end of the term as had always happened previously.  There was never any warning they might not be.

46.  Since the Long-Term Station Operators were not allowed to negotiate with Hudson, and based on representations made by Defendants and Getty Realty, they signed leases which contained provisions with which they did not agree.  For example, some of the Hudson Leases and/or Hudson Agent Agreements have a specific statement that such agreements do not create a franchise relationship under the PMPA.  None of the Long-Term Station Operators believe that to be true.

47.  For another example, each of the Long-Term Station Operators acknowledge in the Hudson Agreements that they have received a so-called Credit Manual which sets forth the circumstances under which station operators can accept credit cards.  In reality, none of the Plaintiffs have ever received a Credit Manual.

**Plaintiffs Bear Virtually All Entrepreneurial Risk and Are Retailers under the PMPA**

48.  The new contracts of adhesion dictated by Defendants improperly purport to strip the franchisees of the protections of the PMPA by falsely labeling them as "commission agents" or "consignees" who do not take title to and therefore do not "buy and sell" gas to retail customers, and ignoring what the Plaintiffs actually do.  This subterfuge should not be countenanced by this Court because, *inter alia*, Plaintiffs bear virtually all of the entrepreneurial risk under the operative agreements, and thus are "retailers" entitled to the protections of the PMPA.

49.  The Hudson Agreements were substantially similar to the Getty Leases and the Getty Commission Contracts that the Long-Term Station Operators had had with GPMI, except that certain language which had earlier proved problematic for GPMI or Getty Realty in cases asserting violations of the PMPA had been changed or deleted.

13

50. The Hudson Agreements continue the legal fiction created by Getty that the station operators do not buy or sell gas; yet both a close read of the Hudson Agreements, as well as the custom and usage with which the parties have implemented the agreements, demonstrates that station operators like the Plaintiffs bear virtually all the entrepreneurial risk of running a gas station and buying and selling gas.

51. It is indisputable that Plaintiffs provide motor fuel to the general public for their ultimate consumption. However, Hudson, following Getty's example, has attempted to create the fiction that the Plaintiffs are not "retailers" because they merely act as an agent for Hudson who is actually selling the gas to the general public. This fiction demonstrates a wanton disregard for the PMPA and is a thinly-veiled attempt to circumvent the PMPA's protection of franchisees.

52. In situations like this, courts have looked at the totality of the circumstances to determine whether the station operator has sufficient entrepreneurial responsibility to be an independent businessman, and hence a "retailer."

53. When one looks at the totality of the circumstances here, the inescapable conclusion is that the Plaintiffs bear virtually all of the entrepreneurial risk for the retail sale of gas to the public and are independent businessman, not employees or agents. In fact, the former Getty Agreements to which the Long-Term Station Operators were previously a party and on which the Hudson Agreements are modeled, included a statement that each lessee was an "independent businessman." When this statement was found to subject Getty to liability under the PMPA, it was omitted from the Hudson Agreements. But little else changed, and the facts that led one to conclude that the PMPA could be applied to the Getty Agreements are still present.

14

**54.**  Notably, at the same time as Defendants purport to deny in the Hudson Agreements that the Plaintiffs conduct a retail gas business in an attempt to avoid the effects of the PMPA, Defendants go to great lengths to make the public believe exactly the opposite.  All receipts for the sale of gas are in the names of the station operators and show Plaintiffs' address and phone number, and Plaintiffs who operate a Citgo branded station are required to display signage which touts that "Our Citgo location is locally owned . . ."

**55.**  Defendants claim that Plaintiffs are not "retailers" under the PMPA because they purportedly do not buy motor fuel.  In reality, Plaintiffs do purchase motor fuel through the requirement that each and every Plaintiff put down a deposit of tens of thousands of dollars for motor fuel.  (Par. 10, Hudson Agreement, when included).  This is in addition to the security deposit for the Hudson Lease, which can also be used toward petroleum purchases.  (Par. 30, Hudson Lease).  The petroleum deposit would be unnecessary if Plaintiffs never buy motor fuel. In most cases, this deposit was paid to GPMI or Getty Realty and lost in the GPMI bankruptcy, and only a small deposit or none paid to Hudson, but Plaintiff Bhalli paid his entire deposit directly to Hudson, and the other Plaintiffs paid a deposit under the Hudson Lease which can be applied to petroleum sales.

**56.**  Of importance, deposits were calculated based on the cost of filling each Plaintiff's storage tanks with motor fuel, and the amount of the deposits were increased when gas prices went up.  Although first GPMI, and now Hudson, like to point to the "fact" that the Plaintiffs do not pay for the gas until after it is sold to demonstrate that the Plaintiffs have no entrepreneurial risk, in fact, the contracts demonstrate that Plaintiffs prepaid for all of the gas in their tanks through the deposits.

15

57.  When Plaintiff Bhalli bought his station in 2015, he was required to give Hudson a deposit of $60,000, which is the approximate cost to fill his two storage tanks, one with regular and one with premium gas.  These "deposits" are apparently not held in a segregated escrow account as a true security deposit would be, or they could not have been "lost" in the GPMI bankruptcy.  In essence, they are a prepayment for the gas.

58.  Furthermore, some of the Hudson Agent Agreements permits Hudson, at its sole discretion, to require payment from Plaintiffs "C.O.D. (Check on Delivery)" for gas deliveries.

59.  Plaintiffs are also required to grant Hudson a security interest in all motor fuel products and to file a UCC-1 in favor of Hudson, or, at Hudson's discretion, some other form of security.

60.  While the Hudson Agreements purport not to require Plaintiffs to pay for gas, but only to deposit the amounts they receive from the sale of gas, this is simply not the case.  Not only can Hudson require payment in advance on a C.O.D. basis, but also Hudson requires the Plaintiffs to account and pay for every drop of gas that is delivered to Plaintiffs, whether or not it is sold.  Whenever there is a discrepancy between the amount sold and the amount delivered, Hudson alleges negligence on the part of the Plaintiff, and there is nothing the Plaintiffs can do about it if they want more gas delivered.  Under the Hudson Agreements, the Plaintiffs must pay for gas lost through alleged negligence.

61.  In a recent example, Plaintiff Zoomcar realized that the pumps, which are owned by Hudson, were "over-pumping."  This is a situation in which the gas pumps pump more gas than the amount of the sale shown on the pump, thereby giving the customer some free gas.  Zoomcar brought this to Hudson's attention and asked Hudson to fix the pumps.  Not only did Hudson fail

16

to fix the pumps, but also Hudson charged Zoomcar for all of the gas that Hudson's own pumps over-pumped.

62.  Similarly, if Hudson were truly the one buying and selling the gas, it should take the credit risk of selling the gas.  It does not.  If gas is purchased on a credit card that later turns out to be no good, that amount is "charged back" to the Plaintiffs.

63.  Defendants justify this by saying they have provided the station operators with a "Credit Manual," which, if followed, prevents any bad credit card sales, and therefore the station operators are only charged back for their own negligence.  In point of fact, none of the Plaintiffs have ever received a Credit Manual, and even if they had, given that almost all gas sales are now self-service with a customer swiping his own credit card at the pumps, it is virtually impossible to prevent all fraudulent or stolen credit cards from going through.  Therefore, a seller of gas to the public is always going to have some credit risk.  In this case, that credit risk is borne entirely by the Plaintiffs.

64.  Furthermore, not all of the motor fuel is sold at the pumps.  Each of the station operators buys branded products for sale to the public in their convenience stores.  Under the Hudson Agent Agreements, all gasoline, diesel, lubricating oils, fuel oils and greases must be branded products bought through Hudson.  These include motor fuel products that are used as additives, as well as a diesel motor fuel component which must be blended in the tank with the diesel sold at the pumps in order for a diesel propelled vehicle to run.  Thus, the Plaintiffs are definitely buying and selling motor fuel to the public which they buy from the distributor.

65.  Even if Plaintiffs were not plainly buying and selling motor fuel, the totality of circumstances makes it crystal clear that Plaintiffs bear virtually all of the entrepreneurial risk of the retail gas business at each of their stations.  Defendants have argued that Plaintiffs do not

17

bear any entrepreneurial risk if they do not set the pricing and get the same commission per gallon regardless of market fluctuation, but this is not true.  In reality, Defendants have wielded their pricing power as a sword to protect themselves from entrepreneurial risk and transfer that risk to the Plaintiffs.

66.  After Getty Realty brought in Hudson, each of the Long-Term Station Operators continued to operate their businesses as they always had, but they found that the pricing of the gasoline by Hudson was often problematic.  Quite often, Hudson deliberately priced the gasoline $.20 to $.30 a gallon above neighboring stations, making it impossible for the Long-Term Station Operators to sell gasoline.  Sometimes, the gas would be as much as $.50 a gallon above neighboring stations, including neighboring stations controlled by Defendants.

67.  When petroleum prices suddenly drop, such that, Defendants would be "selling" gas at a loss, Defendants simply raise the price of gas at Plaintiffs' stations so high that it does not sell.  Meanwhile, the fixed costs of Plaintiffs did not diminish, creating significant financial hardship for each of the Plaintiffs, but preventing Hudson from suffering a loss on its books.

68.  By setting gas prices in a manner that predetermines when gas will sell and when it won't, Hudson is able to protect itself from market risk.  The Plaintiffs, however, have no means to protect themselves from market vicissitudes.  Their fixed costs stay the same.  Indeed, in a difficult market, they do not even have an opportunity to cut costs, as, the Hudson Agreements dictate the hours they must be open and the number of employees who must be on the premises – even when the gas is priced not to sell.  Hudson effectively wields its pricing power in a manner that shifts the economic risk of the marketplace from Hudson to the station operators.

69.  At one point in the summer of 2016, Hudson priced the gas competitively with nearby stations for several weeks.  Each of the Plaintiffs found that their gas sales doubled,

tripled, or in some cases even quadrupled, when the gas was priced fairly.  In retrospect, given the events that followed, it seems apparent that Hudson was shopping the leases and demonstrating profits that could be made if the gas were priced fairly.

**70.**  Defendants cannot deny that Plaintiffs are selling motor fuel, and assert that it is Hudson who is selling motor fuel at the premises, as the Hudson Agreements purport to do, when all of the Plaintiffs and each of their employees are licensed with the New York City Fire Department, state and local environmental authorities and the New York City Department of Consumer Affairs to sell motor fuel at their station location, as required by law.  On information and belief, no one at Hudson is so licensed.  Therefore, Hudson could not even sell motor fuel at any of the Plaintiffs' stations if it wanted to.  Indeed, the Certificate of Fitness from the New York Fire Department, which is required if one wants to sell gas in New York City, is in the name of each employee, and the Certificates are nontransferable.  For someone at Hudson to become licensed with the Fire Department, one of the Plaintiffs would have to certify to the Fire Department that such person is an employee of such Plaintiff.

**71.**  Each lessee must conduct an inventory reconciliation every 10 days for New York State environmental compliance.  Although the work sheet lists each station as "Capitol Petroleum Number __," the requirement to fill it out falls on the licensed individual, or in other words, the Plaintiffs, and the Plaintiffs are responsible for any failure to comply and any fines imposed.

**72.**  Similarly, Plaintiffs must do a daily report on tank measurements and submit to an annual inspection by the New York City Department of Consumer Affairs.  As part of this compliance scheme, the parties selling gas must provide a tax ID number to the appropriate authorities and prominently display the retailer's tax ID on the gas station premises.  Plaintiffs

have repeatedly asked Hudson to supply its tax ID number, since, Hudson alleges that it is the one selling the gas, but Hudson has steadfastly refused. The Plaintiffs' ID numbers are displayed.

**73.** As a consequence of being the licensed parties, any fines for violations of environmental laws or fire regulations are issued to the Plaintiffs and are the responsibility of Plaintiffs. This includes fines for equipment that does not comply with Fire Department rules, even though such equipment is owned by Hudson, as well as any problems with the premises, even though the premises are owned by Hudson. The Plaintiffs may ask Hudson for help in bringing the equipment or the premises into compliance and with paying the fine, and occasionally Hudson acquiesces, but more often it does not. At the end of the day, it is the Plaintiffs who get summoned into court if the issue is not dealt with; whereas, if Hudson is the one buying and selling the gas, it should be the one paying all the fines.

**74.** As part of the Tier 2 compliance filings with the DEC which Plaintiffs must make, information is required as to the gas stored on station property, including the types of gas, the purity, the percentage of octane, etc. Plaintiffs have no control over the purity or chemical makeup of the gas Defendants deliver to Plaintiffs. Yet, when Plaintiff Auto Wiz was fined due to the octane levels in the gas in its tanks, it was told by Capitol that the fine was entirely the responsibility of Auto Wiz.

**75.** Furthermore, the Hudson Agreements make the Plaintiffs specifically responsible for learning, identifying and implementing all environmental laws, hazardous substance handling laws, recycling rules, waste management and waste minimization programs, etc. No guidance is provided by Hudson who claims to be actually conducting the retail gas business. Indeed, each

lessee must indemnify Hudson if the lessee fails to operate the business in compliance with all environmental laws, hazardous substance handling laws and recycling rules.

76.   The Hudson Agreements specifically state that each Plaintiff is not an employee. Not only are the Plaintiffs not employees, but they must hire as their own employees everyone who works at the stations; pay all salaries, benefits, and Worker's Compensation; maintain employer liability insurance, etc.  Defendants take none of this responsibility.  Yet, under the PMPA and applicable law, if one is not an employee, one is an independent businessman, and hence a retailer.

77.   If Plaintiffs were truly not authorized to operate a gas retail business on the premises because such authority belongs only to Hudson, one would expect that Hudson would be responsible for the premises and the equipment necessary for a retail gas business.  Hudson has tried to create the fiction that the retail gas business is its business, and the Plaintiffs are only authorized to operate a convenience store and a car repair service on the premises.  Yet, the Hudson Agreements quite explicitly put all of the requirements for maintenance of the equipment for selling gas and for the premises squarely on the Plaintiffs.  There is a lengthy schedule of required daily, weekly and monthly maintenance which must be performed by the Plaintiffs at their own expense.  Plaintiffs are also responsible for snow removal.  In addition, the Plaintiffs are responsible not just for the up-keep of the equipment and the premises, but also for their security.  Plaintiffs are required to maintain insurance and must pay Hudson for any equipment that is lost, stolen or damaged.

78.   If Hudson were actually running the retail gas business, one would expect it to have certain rules and standards for the business.  In actuality, the Hudson Agent Agreement gives minimal guidance or requires only that the lessee conduct the sale of fuel "responsibly, with due

care, prudence, good judgment and skill." It states that the control of the business of selling gas is left entirely to the lessee. It also states that the lessee is entirely responsible for customer relations, including, where appropriate adjustments to customer accounts. Such adjustments, of course, are at the Plaintiff's own expense. The Agreements purport to require the Plaintiffs to have a training program for their personnel, but Hudson itself provides no training program. If Hudson were the actual operator of multiple retail stations, presumably it would want all of its personnel trained the same.

79. From the public point of view, the gas is being sold to them by the Plaintiffs. The receipts they get say so, and many of the Plaintiffs are required to have signage saying this is a community owned station. Any complaints or adjustments to a customer's account are handled by the Plaintiffs at the Plaintiffs' expense.

80. There are countless other provisions in the Hudson Agreements which make it clear that all of the entrepreneurial responsibility for the retail gas business rests squarely on the shoulders of the Plaintiffs.

81. When GPMI had a master lease with Getty Realty, GPMI passed on all of its entrepreneurial risk to its lessees. The Getty Agreements mirrored the master lease, such that each obligation that GPMI had to Getty Realty, each lessee had to GPMI. On information and belief, Hudson has continued this pattern by imposing all entrepreneurial risk onto the Plaintiffs. The Plaintiffs indemnify Hudson for virtually every obligation it would have to Getty Realty, and in addition, each Plaintiff was required to give a personal guarantee of its principal(s) for all obligations under the Hudson Agreements. Clearly, the Plaintiffs bear all of the entrepreneurial responsibility of a retailer of motor fuel.

82. Based on the foregoing, the Plaintiffs are "retailers" under the PMPA.

**Defendants' and Getty's Further Misrepresentations and Plaintiffs' Detrimental Reliance**

83.  Defendants and Getty Realty made further misrepresentations to Plaintiffs to the effect that they had long-term contractual rights to lull Plaintiffs into a false sense of security.  In reasonable reliance thereon, Plaintiffs invested considerable extra moneys in their respective service stations, to their detriment.

84.  By spring of 2016, there were rumors that Hudson was trying to get out of the gas station business in New York.  To put the station operators at ease, Capitol had a meeting of the Hudson station operators in or about April, 2016, at the Marriott Hotel on Adams Street in downtown Brooklyn.

85.  The meeting was attended by representatives of Capitol, including Terry Fitzgerald, Victor Iroh, and Marshall Yacoe, the Environmental Manager of Capitol.  There were also representatives from Citgo Marketing and Exxon Marketing who spoke about how to increase fuel sales and better market the brand.

86.  At the meeting, Terry Fitzgerald again appeared and spoke on behalf of Capitol and Hudson.  He spoke of the rumors and said Capitol was there to assure the station operators that Capitol and Hudson are your partners for the long-term.  He discussed Hudson and Capitol's plans to invest in improving the stations, so that both lessor and lessee could make more money. The Plaintiffs relied on these statements and redoubled their efforts in their stations.  Many of the Plaintiffs made capital improvements in their stations, which they would not have done without the assurances of Hudson, Capitol and Getty Realty that they would be in their stations for the "long haul."

87.  For example, after the first meeting at the Marriott, Plaintiff A&L installed a new alignment machine and a new tire machine at a cost of $60,000, as well as new lighting at a cost

of $2,000.  Plaintiff Zoomcar, at Hudson's request, put in LED lights last year at a cost of $10,000, split 50/50 with Hudson.  Plaintiff Ocean Avenue invested $20,000 in diagnostic computer equipment.  Similarly, Plaintiff Auto Wiz upgraded its diagnostic equipment at a cost of approximately $10,000.  Such improvements, along with tens of thousands of dollars of other equipment and upgrades, would not have been made had the Plaintiffs known there was any possibility that their leases would not be renewed.

88.  The representations made at these open meetings were far from the only assurances given to the Plaintiffs that they could expect their leases to continue for a long time.  On March 6, 2014, for example, Hudson sent a Letter of Intent to Plaintiff 411 offering to extend 411's Hudson Lease for five years, with one five-year renewal option if 411 invested $100,000 in tenant improvements.  A true and correct copy of said Letter is attached hereto as Exhibit B.  If, as Hudson now claims, its master lease for the property was expiring in December 2016, it is difficult to see how Hudson could make this offer.

89.  Similarly, in the spring of 2015, Plaintiff Bhalli was looking to buy a gas station and saw an ad for a gas station at 64-18 8th Avenue, Brooklyn, with a 29 year lease.  The station in question turned out to be a Hudson property, and Hudson was involved in the negotiations between Bhalli and the then current lessee for Bhalli to purchase the leasehold.  Hudson clearly understood that Bhalli was doing this as a long-term investment, and at no time did Hudson disclose to Bhalli that the lease was for less than the advertised 29 years.  To the contrary, Hudson assured Bhalli that Hudson would be his long-term partner.  Accordingly, Bhalli made a significant investment to acquire the station from the then current lessee.

90.   When Hudson then presented Bhalli with a three-year lease, he was taken aback. Iroh, however, assured Bhalli that this was just how the deals were papered, and that Hudson would be his long-term partner.

91.   When Plaintiff Bhalli complained that he could not get the necessary financing to acquire the station and pay the $60,000 deposit which Hudson was demanding for the gas with only a short-term lease to show his bank, Iroh, then wearing his hat as Retail Business Manager of Hudson, gave Bhalli a letter to show his bank promising that the lease would be renewed.  A true and correct copy of the letter Iroh gave Plaintiff Bhalli to give to his bank is attached hereto as Exhibit C.

92.   Induced by Hudson's representations of a long-term relationship, Plaintiff Bhalli went ahead and borrowed money to take over the Hudson Lease and to pay a deposit for gas to Hudson under the Hudson Agent Agreement.

93.   Defendants continued to assure all of the Plaintiffs that Defendants were their long-term partners in order to encourage the Plaintiffs to invest time and money in their stations and to increase their value.  The Master Lease with Getty Realty was always referred to in terms of 25 years or more.  There was never a hint that the termination of the lease could be imminent.

**Invalid Nonrenewal Notices**

94.   Despite Hudson and Capitol's representations to the contrary, on or about September 19, 2016, a certified letter was sent to each of the Plaintiffs captioned "Notice of Nonrenewal Of Commission Agent Agreement and Commission Agent Station Lease" (hereinafter referred to as the "Nonrenewal Notice").  The letter stated that Hudson would not be renewing the Plaintiffs' leases or commission agent agreements.  The letter went on to say that the "effective date of the nonrenewal will be December 23, 2016."

25

95.   It further stated that the reason for the nonrenewal was that the current ground lease with Getty Realty would soon be ending, and Hudson would no longer have the right to sublease the property to any operator.  These statements were at odds with both Getty Realty's, Capitol's and Hudson's previous representations that Hudson had a long-term lease and was going to be the Plaintiffs' "partner" for a long time to come.  Indeed, these statements are belied by Getty Realty's own 10-K.

96.   The letter further stated that Hudson would be turning properties over to Getty Realty over the next 18 months, and that the lessee could vacate the property ". . . (1) the date of expiration shown above; or (2) the date Hudson is required to return the property to Getty."  There was no "date of expiration" shown above.  Nor was the date Hudson was required to return the property to Getty Realty ever mentioned.

97.   A true and correct copy of the Notice of Nonrenewal of Commission Agent Agreement and Commission Agent Station Lease is attached hereto as Exhibit D.  The Nonrenewal Notices were issued in violation of the PMPA which was designed to protect station operators against this type of unilateral nonrenewal.  Furthermore, the Nonrenewal Notices did not include a summary of the Plaintiffs' rights as required under the PMPA, nor did it meet the requirements for proper notification under the PMPA.  Accordingly, they are not valid as a notice of non-renewal.

98.   None of the Plaintiffs had had any warning that the Nonrenewal Notice was coming. In fact, quite the opposite; they had been assured only a short time earlier at the open meeting that Capitol and Hudson were going to be their partners for the "long-haul."

99.   The Nonrenewal Notices did not provide the Plaintiffs with any real notice as to when they were expected to vacate their property.  The so-called "effective date of nonrenewal"

did not correspond to the end date of a single Plaintiff's lease.  The so-called "expiration date" is not specified anywhere in the Nonrenewal Notice.  The reference to returning the properties to Getty Realty over eighteen months adds further ambiguity.  None of the Plaintiffs could look at the Nonrenewal Notice and reasonably understand what was expected of them.

**Defendants and Getty Fraudulently Induce Plaintiffs in Connection with the Invalid Nonrenewal Notices**

100.  In their confusion, the Plaintiffs reached out to Hudson.  Mr. Victor Iroh, who variously styles himself as a representative of Hudson, Capitol or Consolidated, but always uses a Capitol email address, assured the Plaintiffs that they had nothing to worry about.  He said they had eighteen months to deal with the issue, and a lot could happen in eighteen months.  Plaintiffs were all told not to worry.

101.  In addition, Mr. Giovanni "Nino" Cutillo, the president of the Dealers Group, requested, and had, a meeting with the Chairman of the Board of Getty Realty to ascertain the meaning of the Nonrenewal Notices.  Mr. Cutillo reported back to the Plaintiffs that he was assured by Mr. Leo Leibowitz, the Chairman of the Board of Getty Realty, that the Nonrenewal Notices were nothing to worry about.  On information and belief, Mr. Leibowitz assured Mr. Cutillo that, although Hudson had asked to return some of the properties to Getty Realty, Getty Realty would not allow Hudson to do so, because Hudson had a long-term master lease.  Mr. Leibowitz reportedly added that even if Getty Realty did decide to let Hudson give back certain of the properties from the Master Lease, Getty Realty would find a new distributor and enter into a new master lease, as it had done in the past.  Reminding Mr. Cutillo of how Getty Realty had always made new arrangements, so that, changes in the lessor were seamless for the station operators, Mr. Leibowitz assured Mr. Cutillo that Getty Realty would take care of the station operators.

27

**102.**  Induced by the assurances of both Mr. Iroh of Hudson and Capitol and

Mr. Leibowitz of Getty Realty, which seemed reasonable in light of the past history, the

Plaintiffs took no action in response to the Nonrenewal Notices and did nothing to protect their

rights.

**103.**  Hudson, which debits the Plaintiffs' rent from the Plaintiffs' bank accounts,

continued to debit the rent on a monthly basis as it had always done, even after the term of the

Hudson Leases purportedly ended.  Each of the Plaintiffs paid rent for September, October,

November and December 2016 despite the Nonrenewal Notices, and business continued as usual

for several months.

**<u>Wrongful Termination Efforts</u>**

**104.**  Suddenly, with no warning, Victor Iroh, now as an agent for Capitol Petroleum,

sent Plaintiff SSJ an email from Capitol Petroleum on or about December 4, 2016, asking for

copies of SSJ's phone, Internet, gas and electric bills.  When SSJ inquired why, Iroh replied:

"We need to disconnect all utilities for Getty."  There was no further discussion on the subject.

**105.**  On or about December 14, 2016, with no warning or prior discussion, Iroh sent

emails from Capitol Petroleum to Plaintiffs SSJ and Sadeen purporting to discuss steps they

needed to take to close their businesses by December 22, 2016.  This came with no prior

discussion and was an earlier date then the "date of nonrenewal" referred to in the Nonrenewal

Notices.  The very next day, Hudson on its own initiative debited the accounts of SSJ and Sadeen

for rent for the full month of December.

**106.**  Only when SSJ and Sadeen received these emails did the station operators who had

previously received Nonrenewal Notices realize that they had been lulled into a false

complacency and needed to take action.  At that point, Plaintiffs began to interview legal counsel.

107.  In or about mid-December 2016, each of the Plaintiffs received an email from Iroh advising them that the banking functions of Hudson would be taken over by Consolidated effective January 1, 2017.  Each of the Plaintiffs was instructed to fill out a new EFT authorization form in favor of Consolidated.  Plaintiffs SSJ and Sadeen, who were supposedly terminated prior to such date, received and returned the authorization form, as well.

108.  Significantly, the letter provides: "All current contracts with your company will remain in effect."  Yet, when this letter went out, Defendants were already starting to fail to deliver petroleum to certain of the Plaintiffs.

109.  As with all other agreements between the Plaintiffs and Defendants, there was no negotiation concerning the new EFT authorization.  When Plaintiff Zoomcar emailed Iroh to say they were concerned whether it required a contract amendment to send their payments to Consolidated instead of Hudson, as required in the Hudson Agreements, Zoomcar was summarily dismissed by Iroh, who emailed back: "This is not a negotiation tool.  Just sign it."

110.  Since the date of the new EFT authorizations, the Plaintiffs have had little, if any, interaction with Hudson.  All business has been conducted through Consolidated and Capitol. The only business conducted by Hudson has been formal legal notices, most of which have come from attorneys.

111.  Eventually, through counsel, SSJ and Sadeen objected to being asked to leave the stations that were their livelihood on a week's notice, especially in light of the fact that they had paid rent through December 31, 2016, and were entitled to the quiet enjoyment of their property

through at least such date.  Both SSJ and Sadeen continued to perform under the Hudson Agreements.

**112.**  SSJ and Sadeen entered into negotiations with Hudson.  The goal from the Plaintiffs' point of view was to stay in the gas stations for many more years as they had been promised.  The goal from Hudson's point of view was to remove the two Plaintiffs from the stations as soon as possible.  Not surprisingly, the negotiations were fruitless.

**113.**  During the negotiations, both SSJ and Sadeen continued to perform under the Hudson Agreements.  In the Nonrenewal Notice, Hudson had given plaintiffs SSJ and Sadeen the right to a holdover tenancy for an unspecified period of time.  Subsequently, Hudson had paid itself rent for the entire month of December, 2016, from Plaintiffs' accounts.

**114.**  Accordingly, the Hudson Agreements with SSJ and Sadeen were valid and in effect at least through December 31, 2016.  Thus SSJ and Sadeen continued to perform all of their obligations under the Hudson Agreements; however, Hudson breached the Hudson Agreements by failing to deliver petroleum products as required under the Hudson Agent Agreement.  As a result of this breach, both SSJ and Sadeen ran out of gas prior to the busy Christmas holiday.  Neither Plaintiff had any gas to sell during the holiday season, which is normally one of their busiest times of year, and thus they suffered significant economic loss.

**115.**  Hudson has not made any gas deliveries to either SSJ or Sadeen since Hudson wrongfully stopped doing so in December 2016.

**116.**  Since then, Hudson has unilaterally and without warning discontinued petroleum deliveries to many of the Plaintiffs, causing them severe economic injury.  In a blatant attempt to make the Plaintiffs suffer economically so that they will vacate the stations, Hudson has stopped petroleum deliveries to Plaintiffs SSJ, Sadeen, A&L and Cranbrook.

**Defendants' Dirty Tricks to Try to Manufacture a "Default" Under the Franchise Agreements**

117.  Not content with their progress in trying to wrongfully non-renew Plaintiffs' franchise agreements, Defendants have resorted to dirty tricks to attempt to manufacture defaults under the Hudson Agreements as an excuse for terminating the agreements.  These so-called defaults are largely of Hudson and Capitol's own making.

118.  For example, certain environmental protocols must be followed when a petroleum storage tank is permanently taken out of use.  As mentioned, Hudson has stopped delivering petroleum to certain of the Plaintiffs, but the Plaintiffs had not given up hope that Hudson would once again honor its contractual obligations to deliver petroleum.  On information and belief, Hudson suggested to the appropriate environmental authorities that they should inspect each of the stations where gas was no longer being delivered, indicating that the storage tanks were permanently out of use.  Of course, when the inspectors did so, they found violations, as the protocols for permanently shutting down the tanks had not been followed, because none of the Plaintiffs believe that their tanks are permanently out of use.  The Plaintiffs are obligated under the Hudson Agreements to operate the stations in accordance with all environmental laws and regulations; so, technically, this created a default.

119.  In a similar example, on information and belief, Capitol, in order to bring pressure on Plaintiff Sadeen to leave his station, reported to Citgo that there was no longer a valid supply agreement for Citgo-branded fuel at Sadeen's location, even though, Capitol is aware that Sadeen is contesting the alleged non-renewal.  Citgo would have had no way of ascertaining this information except from Capitol.  As a result of Capitol's taking this action, on or about April 28, 2017, counsel for Citgo sent a threatening letter to Plaintiff Sadeen threatening to take legal action against Sadeen for the unauthorized use of Citgo trade dress " . . . Because there is

31

no longer a valid supply agreement for CITGO-branded fuel for this Location." Tellingly, Iroh is copied on the letter.

120. In another example, when a gas station customer uses a fraudulent credit card, and it is discovered when the card is processed, the processor, which is Citgo for many of the Plaintiffs, charges back the amount of the credit card purchase to Hudson. Hudson, in turn, charges it back to the gas station lessee. Each of these chargebacks must occur fairly soon after the purchase, since, Hudson has a limited time to protest the chargeback to Citgo, and the gas station lessee has a limited time to protest the chargeback to Hudson.

121. On information and belief, in order to manufacture a purported default, Hudson, in violation of its own internal policies, did not present Plaintiff Cranbrook with any of its chargebacks for several months. As a result, Cranbrook allowed the customers with suspect cards to continue using such cards, because, Cranbrook had no knowledge that there was a problem with the credit cards. Accordingly, Cranbrook incurred much larger chargebacks than it would have had it been notified of the problems promptly. In addition, Cranbrook lost the opportunity to protest the chargebacks because Cranbrook was not aware of them during the appropriate time in which to protest.

122. As a result of Hudson's conduct, alleged chargebacks against Cranbrook accrued without Cranbrook's knowledge in an amount in excess of $21,000. Hudson, knowing that Cranbrook never had this amount in its bank account at one time, debited such amount all at once from Cranbrook's account, after months of not processing any chargebacks. The debit was dishonored by Cranbrook's bank for insufficient funds, thus manufacturing a breach of the Hudson Agreements. On information and belief, it is particularly important to Hudson to drive

Cranbrook out of it station, because, as a newly purchased station, Cranbrook has a lease which runs through March 31, 2018.

123.   Although the propriety of the chargebacks is certainly in doubt, Cranbrook nonetheless attempted to repay Hudson over time, and has, in fact, paid Hudson.  Hudson, nonetheless, used this manufactured default to stop delivering petroleum to Cranbrook.

124.   At one point, Hudson, through its attorneys, agreed that if the principal of Cranbrook, Plaintiff Bhalli, would allow Iroh to pick up a certified check for $8,780, Hudson would immediately recommence delivering petroleum.  Bhalli had the certified check drawn up immediately and called Iroh to pick it up, as agreed.  Iroh failed to pick up the check for more than two weeks, during which time, no petroleum was delivered, causing Cranbrook to permanently lose its fleet sales and suffer other grievous economic injury.

125.   Eventually, Iroh came for the check, which Hudson cashed; however, Hudson breached its obligation to re-institute petroleum deliveries, and Cranbrook has not received any more petroleum to this day.  Rather, while it accepted the proffered cure, Hudson ignored it and used the so-called default to serve a Ten Day Notice to Quit on Cranbrook, and subsequently to institute eviction proceedings.

126.   Ever since SSJ and Sadeen refused to vacate their premises, believing that the Nonrenewal Notice was both ineffective and in violation of the PMPA, Hudson, Consolidated and Capitol have badgered the Plaintiffs, manufactured alleged defaults, and done everything they could to make business unpleasant.  Hudson served Thirty Day Notices to Quit on both Sadeen and SSJ.  When SSJ did not quit, Hudson instituted eviction proceedings, and it has since instituted eviction proceedings against Sadeen, as well.

**127.** About this time, Iroh approached one of the principals of Plaintiff A&L.  Iroh told the A&L representative that the reason A&L's rent is so high is the enormous real estate tax on the property.  He went on to say that Getty Realty had decided to protest the tax, which would only help A&L, but that in order for Getty Realty to get the taxes really low, it would have to appear that there was no functioning business at the location.  In order to create that impression for purposes of the tax appeal, Iroh requested that A&L agree to disconnect its account with Commonwealth Edison.  With no electricity running to the property, it would look deserted for purposes of the tax appeal.  Iroh indicated that Getty Realty would bring in a generator for A&L's business, and that electricity would continue undiminished.  Iroh assured A&L that the electricity would be uninterrupted.

**128.** Finding this story highly suspicious, and affronted that Iroh would ask A&L to participate in a fraud, A&L concluded that the entire story was a subterfuge to leave A&L with no electricity, so that, it could not operate its business and would agree to leave.  As a result, A&L refused to disconnect its utility.

**129.** As soon as A&L told Iroh that it would not disconnect from Commonwealth Edison, Hudson served a Thirty Day Notice to Quit on Plaintiff A&L.  When A&L did not graciously get up and leave behind a business that took a lifetime to build up, Hudson sued for eviction.

**130.** The eviction proceedings against SSJ, Sadeen, A&L and Cranbrook are pending in the Civil Court of the City of New York, Kings County.

**131.** Hudson, Consolidated and Capitol continue to alternately badger and cajole the Plaintiffs.  Most of the badgering and cajoling has been done by Iroh, who currently claims to be a representative of Capitol, and uses a Capitol email address.

06/12/2017 SL1 1462809v4 111056.00001

**132.** In a recent example, Plaintiff Auto Wiz sought Capitol's help in repairing a spring in a gate, a relatively simple matter. The spring was repaired, but Capitol debited the account of Auto Wiz $2,700 for the repair. Outraged, a representative of Auto Wiz contacted the repair service to ask for a copy of the invoice. To its surprise, Auto Wiz was told by the repair service that it had not yet invoiced Capitol for the repair. The repair service estimated that the cost would be under $300.

**133.** Auto Wiz went back to Iroh and demanded that the $2,700 debit be reversed. At first, the debit was reversed. Then, Capitol once again, with no advance warning, debited the Auto Wiz bank account $2,700 for the repair. When Auto Wiz inquired as to why the money was taken out of its account again, it was told by Capitol that Capitol could charge Auto Wiz anything it wanted for the repair, and it was not required to charge what it had paid. Capitol had decided to take a 900% markup. Clearly, this was being done in breach of the Hudson Agreements and the covenant of good faith and fair dealing simply to harass Auto Wiz.

**134.** This is not an isolated incident. Hudson and Capitol have done everything they can to bring pressure on the Plaintiffs and force them to leave their businesses. Iroh has alternately harassed and cajoled the Plaintiffs. He has gone from the one extreme of threatening Cranbrook that "I will see to it that you never get another drop of gas again," to the opposite extreme of telling SSJ that if they would just name a reasonable price to get out of the station, Defendants would lean on Getty Realty and get them to pay it. He has made similar statements to other Plaintiffs.

**135.** All of the Plaintiffs live in fear of what Hudson, Consolidated and Capitol will do next. At this point, Hudson has stopped delivering gas to Plaintiffs SSJ, Sadeen, A&L, and Cranbrook; has served Notices to Quit on Plaintiffs SSJ, Sadeen, A&L and Cranbrook; and has

35

commenced eviction proceedings against said Plaintiffs, as well.  All of this based on an ineffective Nonrenewal Notice which violates the PMPA.

## V.  RELIEF REQUESTED

### COUNT I

### Wrongful Non-Renewal in Violation of the PMPA,
### 15 U.S.C. §§ 2802(b)(2)(C) and 2802(c)(4)

**136.**  Plaintiffs re-allege paragraphs 1 through135 as if set forth in full herein.

**137.**  The Petroleum Marketing Practices Act, 15 U.S.C. 2801 *et seq.* ("PMPA") governs franchises for the sale of petroleum products and strictly regulates the requirements for a distributor of motor fuel, such as Defendants, to terminate or non-renew the franchises of retailers of motor fuel, such as Plaintiffs.

**138.**  The term "franchise" means " . . . any contract . . . between a distributor and a retailer, under which a . . . distributor . . . authorizes or permits a retailer or distributor to use, in connection with the sale, consignment or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorize or permit such use."  15 U.S.C. § 2801(1)(A).

**139.**  The term "franchise" includes "(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy; [and] (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner . . . ."  15 U.S.C. 2801(1)(B)(i) and (ii).

36

**140.**   The Hudson Agreements authorize and permit the Plaintiffs to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by a refiner which supplies motor fuel to Hudson, Consolidated and Capitol, which authorizes or permits such occupancy.

**141.**   The Hudson Agreements pertain to the supply of motor fuel which is to be sold, consigned or distributed.

**142.**   Accordingly, if Hudson, Consolidated or Capitol is a distributor, and the Plaintiffs are retailers, the Hudson Agreements fall squarely within the definition of a franchise and are entitled to the protection of the PMPA.

**143.**   15 U.S.C. § 2801(6)(A) defines the term "distributor" as ". . . [A]ny person, including any affiliate of such person, who purchases motor fuel for sale, consignment, or distribution to another . . . "

**144.**   Capitol purchases motor fuel for sale, consignment, or distribution to another.  On its website, Capitol states that it supplies "Shell, ExxonMobil, Valero, and Citgo-branded locations in the Metropolitan Washington, DC and New York area."  It goes on to state that "Capitol Petroleum Group is a leading wholesale distributor of petroleum services in the Metropolitan Washington DC and New York City regions."

**145.**   Since Capitol is a "distributor," its affiliates Hudson and Consolidated are also distributors pursuant to the statutory definition.

**146.**   15 U.S.C. § 2801(7) defines the term "retailer" to mean "[A]ny person who purchases motor fuel for sale to the general public for ultimate consumption."

147.  As detailed above, Plaintiffs bear virtually all of the entrepreneurial risk under the operative agreements of providing motor fuel to the general public.  As previously demonstrated, Plaintiffs are "retailers" under the scope of the PMPA and are entitled to all protections thereunder.

148.  Accordingly, the Hudson Agreements create a protected "franchise" under the PMPA.

149.  As a franchise protected by the PMPA, there are very limited events contemplated by the PMPA for nonrenewal of a franchise agreement under 15 U.S.C. § 2802(b)(2)(C).  One of these is the franchisor's loss of the right to grant possession of the leased premises due to **expiration** of an underlying lease, **but only if the franchisee was notified in writing prior to the commencement of the term of the then existing franchise of the duration of the underlying lease and the fact that the underlying lease might expire and might not be renewed at the end of the term**.  11 U.S.C. § 2802 (c)(4).

150.  In the Nonrenewal Notice, Hudson claims that the reason for the nonrenewal is the loss of the underlying lease.  However, none of the Plaintiffs was given notice, in writing or otherwise, at the commencement of the term that the underlying lease might expire at the end of the term and might not be renewed.

151.  Indeed, on information and belief, Hudson could not have given such a notice at the commencement of the term, because it would not have been true.  On information and belief, the underlying Master Lease has not expired.  Rather, Hudson has chosen to give the properties back to Getty Realty before the expiration of the lease term, and in the process caused grievous injury to the Plaintiffs.

38

**152.**  Thus, the nonrenewal is in violation of the PMPA, and the Nonrenewal Notices are in violation of the PMPA, have no legal force or effect, and are void *ab initio*.  Furthermore, the grounds stated by Hudson are not valid; as, on information and belief, the underlying Lease has not expired.

**153.**  For the injuries sustained by Plaintiffs as a result of Defendants' wonton disregard of the PMPA and, in particular, their willful violation of Section 2802 (c)(4), Plaintiffs demand damages in an amount to be established at trial, but not less than ten million dollars ($10,000,000), plus attorneys' fees, expert witness fees and other costs and exemplary damages, pursuant to 15 U.S.C. § 2805(d)(1).

## COUNT II

### Failure to Offer a Right of First Refusal in Violation of the PMPA, 15 U.S.C. § 2802 (b)(2)(E)

**154.**  Plaintiffs reallege paragraphs 1 through 153 as if set forth in full herein.

**155.**  Another specific exception to the general rule against nonrenewal, although not cited by the Defendants, is that the franchisor is allowed to not renew a franchise relationship if the franchisor makes a determination in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area.  15 U.S.C. § 2802(b)(2)(E).

**156.**  All of the Plaintiffs are located near one another in Brooklyn, New York.  The franchisor has decided to leave the relevant geographic market area.

**157.**  The exception for a general market withdrawal, however, has certain restrictions. First, the determination must be made after the date the franchise was entered into or renewed and must have been based on the occurrence of changes in relevant facts and circumstances after that date.  15 U.S.C. § 2802(b)(2)(E)(i)(I-III).

06/12/2017 SL1 1462809v4 111056.00001

**158.**   The Plaintiffs are not aware of any changes in relevant facts and circumstances since their franchise with Hudson was entered into.  Therefore, this restriction is present and prohibits non-renewal.

**159.**   The second restriction is that the non-renewal cannot be for the purpose of converting the premises to operation by the franchisor's own employees or for its own account.  15 U.S.C. § 2802(b)(3)(A)(ii).  Plaintiffs currently have no information to allow them to make a determination whether there is compliance with this restriction.

**160.**   The final restriction states that when, as here, the premises are leased, the lessee must be offered a right of first refusal.  The right of first refusal requirement under 15 U.S.C. § 2802(b)(2)(E)(iii) requires that the franchisor must either (i) during the 180-day period after notification pursuant to the PMPA (which notification was never given properly in these cases), make a *bona fide* offer to sell, transfer, or assign to the franchisee such franchisor's interest in the premises, or, if applicable, offer the franchisee a right of first refusal of at least 45 days duration of an offer made by another to purchase such franchisor's interest in the premises; or (ii) in the case of a sale, transfer, or assignment to another person of the franchisor's interest in such premises, such other person must offer, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee.

**161.**   No right of first refusal or offer to assign the franchisor's interest in the Hudson Agreements was ever made to any of the Plaintiffs by Defendants or Getty Realty.

**162.**   Several of the Plaintiffs contacted both the Defendants and Getty Realty in an attempt to see if they could lease or buy their stations directly.  In all cases their expressions of interest were spurned.  In one case, Getty Realty, not realizing that it was dealing with an existing station operator, actually started to negotiate with one of the Plaintiffs for the purchase

40

by the Plaintiff of his station.  When Getty Realty realized that it had been approached by the existing station operator, it sent the Plaintiff an email saying it could not negotiate with the station operator.

163.  The Defendants' conduct has clearly violated 15 U.S.C. § 2802(b)(2)(E)(iii) and in doing so has caused the Plaintiffs grievous economic injury.  In particular, the failure to offer the required right of first refusal or to assign the franchisor's interest in the leasehold has grievously harmed the Plaintiffs.

164.  For the injuries sustained by Plaintiffs as a result of the Defendants' willful violation of 15 U.S.C. § 2802(b)(2)(E)(iii), Plaintiffs demand damages in an amount to be established at trial, but not less than 10 million ($10,000,000) dollars, plus attorneys' fees, expert witness fees and other costs, interest and exemplary damages on account of Defendants' wanton disregard of the PMPA.

## COUNT III

### Failure to Give Proper Notice in Violation of the PMPA, 15 U.S.C. §§ 2804(c) and (d)

165.  Plaintiffs reallege paragraphs 1 through 164 as if fully set out herein.

166.  Even if Defendants had had appropriate grounds for nonrenewal of the franchises, which Plaintiffs dispute, said nonrenewal is not valid unless the notification requirements of section 2804 of the PMPA are met.  15 U.S.C. § 2802(b)(1)(A).

167.  Section 2804 requires for a notice of nonrenewal to be effective it must include a statement of the intention to not renew the franchise relationship, together with the reasons therefor; the date on which such termination or nonrenewal takes effect; and a summary statement summarizing a party's rights under the PMPA which is prepared by the Secretary of Energy and published in the Federal Register.  15 U.S.C. § 2804(c)(3)(A)-(C).

41

**168.**  The Nonrenewal Notices did state the intention to not renew the franchise.  The Nonrenewal Notices gave as a reason that the underlying lease was terminating; however, on information and belief, this is not true.  Rather, Hudson is voluntarily giving the properties back to Getty Realty and exiting the marketplace, a fact which was not disclosed, in violation of 15 U.S.C. § 2804(c)(3)(A).

**169.**  The Nonrenewal Notices did state that the nonrenewal would take effect on December 23, 2016, but went on to say that the franchisees could stay in their stations either until the "expiration date," which is not specified, or a date sometime in the next 18 months when Hudson would give the property back to Getty Realty, which date is also not specified.  Accordingly, the Nonrenewal Notices provided no effective notice of the date on which the nonrenewal would take effect, in violation of 15 U.S.C. § 2804(c)(3)(B).

**170.**  The Nonrenewal Notice did not include the summary of the parties' rights required to be furnished under the provisions of Section 2802(b)(2)(D) of the PMPA, in violation of 15 U.S.C. § 2804 (c)(3)(C).

**171.**  As the Nonrenewal Notices failed to comply with the requirements for giving notice under the PMPA, they are ineffective to non-renew a franchise.

**172.**  Wherefore the Plaintiffs request a declaration from this court that the Nonrenewal Notices have no legal force and effect and are void *ab initio*, and Plaintiffs demand damages in an amount to be established at trial, but not less than $10 million ($10,000,000) dollars.

## COUNT IV

### Violations of the New York Franchises for the Sale of Motor Fuels Act
### N.Y. Gen. Bus. L. §§ 199-a *et seq.*

**173.** Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 172 above as though fully set forth herein.

**174.** Plaintiffs allege that their relationship with Defendants is covered by the PMPA; however, in the alternative, if this court finds they are not covered by the PMPA, Plaintiffs assert that their relationship with defendants is covered by the New York Franchises for the Sale of Motor Fuels Act.

**175.** The New York Franchises for the Sale of Motor Fuels Act, N.Y. Gen Bus. L. §§ 199-a *et seq.* ("NY Act") governs franchises for the sale of motor fuels.  The term "franchise" means "any agreement between a distributor and a dealer under which the dealer is granted the right to use a trademark, trade name, service mark, or other identifying symbol or name owned by the distributor, or to which the distributor has the right to authorize the use thereof, and is furnished by the distributor with products to be sold at retail under such trademark, trade name, service mark, or other identifying symbol or name, or any agreement between a distributor and a dealer under which the dealer is granted the right to occupy or use premises or facilities owned, leased, or controlled by the distributor, for the purpose of engaging in the retail sale of motor fuels of the distributor, provided that an agreement by one distributor to lease premises or facilities to another distributor shall not constitute a franchise." N.Y. Gen Bus. L. § 199-a(3).

**176.** N.Y. Gen Bus. L. § 199-a(4) defines the term "retail" as "the sale of motor fuels to the consuming public for the purposes other than resale."

**177.** The Hudson Agreements are not only (a) agreements between (i) Hudson, Consolidated and/or Capitol and (ii) Plaintiffs, under which Plaintiffs are granted the right to use a trademark, trade name, service mark, or other identifying symbol or name to which Hudson, Consolidated and/or Capitol has the right to authorize the use thereof, and Plaintiffs are furnished

by Hudson, Consolidated and/or Capitol with products to be sold at retail under such trademark, trade name, service mark, or other identifying symbol or name, but also (b) agreements between Hudson, Consolidated and/or Capitol and Plaintiffs under which Plaintiffs are granted the right to occupy or use premises or facilities owned, leased, or controlled by Hudson, Consolidated and/or Capitol, for the purpose of engaging in the retail sale of motor fuels.

178. The Hudson Agreements pertain to the supply of motor fuel which is to be sold, consigned or distributed.

179. N.Y. Gen Bus. L. § 199-a(1) defines the term "distributor" as "any person engaged in the sale, consignment, or distribution of motor fuels to dealers." Pursuant to this definition, Capitol, Hudson and Consolidated are all "distributors."

180. N.Y. Gen Bus. L. § 199-a(2) defines the term "dealer" to mean "any person engaged in the retail sale of motor fuels for use in motor vehicles under a franchise entered into with a distributor." Pursuant to this definition, each of the Plaintiffs is a "dealer"; as, each is licensed to retail motor fuel to New York consumers and does so.

181. Accordingly, since Hudson, Consolidated and Capitol are each a distributor, and the Plaintiffs are dealers, the Hudson Agreements fall squarely within the definition of a franchise and are entitled to the protection of the NY Act.

182. Defendants' acts including, without limitation, requiring Plaintiffs to sell gasoline at an unreasonable price, constitutes a failure to comply with the substantive requirements of the Hudson Agreements and the failure to act in good faith in carrying out the terms of the franchise, in violation of N.Y. Gen. Bus. L. § 199-c.

183. Wherefore, Plaintiffs seek damages for the above statutory violations and the loss of value with respect to Plaintiffs' franchises in an amount to be determined at trial but not less than

ten million dollars ($10,000,000.00), plus punitive damages in an amount to be determined at trial.

## COUNT V

### Failure to Disclose in Violation
### of the New York Franchises for the Sale of Motor Fuels Act,
### N.Y. Gen. Bus. L. §§ 199-a *et seq*.

**184.**  Plaintiffs re-allege paragraphs 1 through 183 as if set forth in full herein.

**185.**  Before any franchise is entered into, the NY Act requires a distributor to fully disclose in writing to any prospective dealer all restrictions on the sale, transfer, renewal and termination of the franchise.  N.Y. Gen Bus. L. § 199-b(6).

**186.**  Defendants deliberately failed to provide any of the Plaintiffs with the disclosures required by the NY Act.  As a direct result of this non-disclosure, Plaintiffs reasonably relied on Defendants' promises of a long-term partnership and continued to work and invest in their businesses to increase their value.  They were caught completely unaware by the early non-renewal, causing them grievous economic injury.

**187.**  For the injuries sustained by Plaintiffs as a result of Defendants' willful violation of the NY Act, Plaintiffs demand damages in an amount to be established at trial, but not less than $10,000,000, plus punitive damages on account of Defendants' wanton disregard of the NY Act.

## COUNT VI

### Wrongful Non-Renewal of Franchise in Violation of
### the New York Franchises for the Sale of
### Motor Fuels Act, N.Y. Gen Bus. L. §§ 199-d *et seq.*

**188.**  Plaintiffs reallege Paragraphs 1 through 187 as if fully set forth herein.

**189.**  As a franchise protected by the NY Act, nonrenewal of the Hudson Agreements can only occur for good cause and provided none of Hudson, Consolidated or Capital supplies the

45

service station with motor fuels for a period of one year after the non-renewal of the lease.  N.Y. Gen Bus L. § 199-c(1)(c).

190.  No good cause exists for Defendants to fail to renew Plaintiffs' Hudson Agreements.

191.  Plaintiffs have been advised that Hudson contends that it does have good cause to not renew Plaintiffs' Hudson Agreements, because, it is their contention that they have a good business reason to return the stations to Getty Realty, because Defendants are losing money on Plaintiffs' service stations.  However, any losses suffered by Defendants are a direct result of Defendants' unfair billing practices which violate New York State law.

192.  As stated above, Hudson has set the prices for gas sold at the Plaintiffs' service stations much higher than Plaintiffs' neighboring service stations.  This has impeded the Plaintiffs' ability to sell gas at all, much less in a profitable manner, and has cost Plaintiffs other economic harm from the loss of traffic through their stations due to the abnormally high prices.  During the limited time when Hudson has permitted Plaintiffs to sell gas at market rates, Plaintiffs' sales have increased greatly, doubling, tripling, and sometimes quadrupling in volume.  Had Defendants set the selling price for gas at a fair, competitive price as required by law, Plaintiffs' stations would have been profitable.

193.  To allow Defendants to use the non-profitability of Plaintiffs' service stations which was caused by Defendants' own actions as the "good cause" required for nonrenewal would be unfair.  Defendants should not be allowed to manipulate the law by using a problem entirely of their own making to their advantage to destroy Plaintiffs' businesses.  This does not provide them a basis for nonrenewal under the NY Act.

194.  Thus, the nonrenewal is in violation of the N.Y. Act.

06/12/2017 SL1 1462809v4 111056.00001

**195.**  For injuries sustained by Plaintiffs as a result of Defendants' willful violation of the N.Y. Act, Plaintiffs demand damages in an amount to be established at trial, but not less than ten million ($10,000,000) dollars, plus damages on account of Defendants' wanton disregard of the N.Y. Act.

## COUNT VII

## Equitable Estoppel

**196.**  Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 195 above as though fully set forth herein.

**197.**  Defendants, individually and as a single corporate entity, made false representations to Plaintiffs regarding:  (i) the length of time Defendants would have the right to sublease the service station properties to Plaintiffs pursuant to Defendants' Master Lease with Getty; (ii) the long-term commitment Defendants were making to partner with Plaintiffs and invest in the station properties; and (iii) the long-term business partnership that would be enjoyed between Plaintiffs and Defendants for twenty-five years.  Representatives of Defendants repeatedly represented to Plaintiffs that Getty and the Defendants entered into a twenty-five-year long-term Master Lease and that none of the Plaintiffs would lose their leases or operating agreements over the next twenty-five years.  Defendants repeatedly represented to Plaintiffs that Defendants were coming aboard "for the long-term", would invest in the stations, and would be excellent long-term partners to Plaintiffs.

**198.**  Defendants, by repeatedly representing that they held a long-term lease with Getty and that they were giving Plaintiffs a long-term commitment to be business partners with Plaintiffs and invest in the stations, induced Plaintiffs to enter into the Hudson Agreements

47

despite their short term, invest large amounts of money in their gas station businesses, and put considerable time and effort into building up the goodwill of the businesses.

199.   Plaintiffs were never provided copies of the Master Lease between Getty and Defendants, nor any of Defendants' financial information, including, without limitation, budgets and projections for investing in the stations.

200.   Plaintiffs lacked knowledge of the true facts concerning the length of time Defendants could and would sublease the Station properties to them pursuant to the Master Lease, as well as of the length and depth of Defendants' commitment to their partnership with Plaintiffs.  Plaintiffs were unaware that Defendants may be required to surrender Plaintiffs' subleased properties to Getty after only three years.

201.   Defendants' statements and conduct amount to false representations and concealment of material facts, and are inconsistent with the facts that Defendants seek to assert in the Nonrenewal Notices.

202.   At all relevant times, Defendants, but not Plaintiffs, were aware of the real facts.

203.   Defendants at all times intended that Plaintiffs rely on the false information and concealment of true facts by Defendants in order to induce Plaintiffs to enter into the Hudson Agreements, invest large amounts of money in their gas station businesses and put considerable time and effort into building up the goodwill of the gas station businesses and increasing their value.

204.   Defendants' scheme worked, because, Plaintiffs did so.

**205.** Accordingly, Defendants should be equitably estopped from asserting or taking any actions in furtherance of the assertions that

(i)  they do not have the right to sublease the gas station premises to Plaintiffs for twenty-five years;

(ii)  they are immediately non-renewing any of the Hudson Agreements;

(iii)  their commitment to partner with the Plaintiffs and invest in Plaintiffs' stations is not significant or for less than twenty-five years; and

(iv)  they are in a partnership with Plaintiffs for less than twenty-five years.

**206.** Wherefore, Plaintiffs request that this Court enter a declaratory judgment declaring that Plaintiffs are equitably estopped from asserting the four items set forth in the preceding paragraph or taking any actions in furtherance thereof.

## COUNT VIII

### Promissory Estoppel

**207.** Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 206 above as though fully set forth herein.

**208.** Defendants, individually and as a single corporate entity, made definitive promises to Plaintiffs.  Defendants promised Plaintiffs (i) that Defendants would have the right to sublease the service station properties to Plaintiffs for twenty-five years pursuant to a long-term Master Lease with Getty, (ii) Defendants would invest in the service station properties; and (iii) Defendants and Plaintiffs would enjoy a mutually profitable business partnership for the next twenty-five years.  These promises were clear and unambiguous.

**209.** Defendants made a clear and unambiguous promise to Plaintiff Bhalli that they would renew his Hudson Lease, and that the underlying lease on his station was for twenty-nine

49

years.  Not only did Plaintiff Bhalli reasonably and foreseeably rely on these promises, but also, Defendants put the promise to renew his Hudson Lease in writing with the explicit expectation that he would give the writing to his bank to induce the bank to give him a business loan.  Bhalli reasonably and foreseeably relied on this written promise in making his decision to take out a loan, which has caused him grievous economic injury.

210.  Plaintiffs reasonably and foreseeably relied on Defendants' clear and unambiguous promises.  Based on these promises, Plaintiffs entered into the Hudson Agreements with Defendants, invested large amounts of money into their gas station businesses, and put considerable time and effort into building up the goodwill of their businesses to increase their value.  It was reasonable and foreseeable for Plaintiffs to rely and act on these promises.

211.  Accordingly, Defendants should be estopped from not honoring their promises.

212.  Wherefore, Plaintiffs seek specific performance of Defendants' clear and unambiguous promises, or, in the alternative, the damages suffered by Plaintiffs as a result of their reliance upon Defendants' clear and unambiguous promises in amount to be determined at trial but not less than ten million dollars ($10,000,000.00).

### COUNT IX

### Fraud

213.  Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 212 above as though fully set forth herein.

214.  Defendants, individually and as a single corporate entity, fraudulently concealed from Plaintiffs that they may surrender Plaintiffs' locations to Getty sooner than twenty-five years from the inception of the Hudson leases and omitted to provide to Plaintiffs material information as to their real intentions with respect to Plaintiffs' gas station properties.

50

215.  As described more particularly above, Defendants knowingly made repeated misrepresentations and omissions of material facts concerning:  (i) the length of time Defendants would sublease the service station properties to Plaintiffs; (ii) the possibility that they may surrender Plaintiffs' locations back to Getty after just three years; (iii) the length and depth of Defendants long-term commitment to Plaintiffs' businesses and Defendants' investment in such businesses; and (iv) the nature of the long-term business partnership between Plaintiffs and Defendants which would be enjoyed for the next twenty-five years.  Defendants knew that their representations were false and that their deliberate omissions created a false impression at the time they were made.

216.  Defendants intended for Plaintiffs to rely on these omissions and misrepresentations.  Plaintiffs reasonably and foreseeably relied on Defendants' omissions and misrepresentations, and as a result entered into the Hudson Agreements, invested large amounts of money in their gas station businesses, and put considerable time and effort into building up the goodwill of the gas station businesses and increasing their value.

217.  Defendants' attempts to terminate the very businesses which their knowing misrepresentations and omissions caused Plaintiffs to spend so much time and money to build up is causing Plaintiffs grievous economic injury of not less than ten million ($10,000,000) dollars.

218.  Wherefore, Plaintiffs demand damages in an amount to be determined at trial, but not less than ten million dollars ($10,000,000.00).

## COUNT X

### Fraud in the Inducement

219.  Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 218 above as though fully set forth herein.

51

220.  Defendants, individually and as a single corporate entity, fraudulently concealed from Plaintiffs that they may surrender Plaintiffs' locations to Getty sooner than twenty-five years from the inception of the Hudson leases and omitted to provide to Plaintiffs material information as to their real intentions with respect to Plaintiffs' gas station properties.

221.  As described more particularly above, Defendants knowingly made repeated misrepresentations and omissions of material facts concerning:  (i) the length of time Defendants would sublease the service station properties to Plaintiffs; (ii) the possibility that they may surrender Plaintiffs' locations back to Getty after just three years; (iii) the length and depth of Defendants long-term commitment to Plaintiffs' businesses and Defendants' investment in such businesses; and (iv) the nature of the long-term business partnership between Plaintiffs and Defendants which would be enjoyed for the next twenty-five years.  Defendants knew that their representations were false and that their deliberate omissions created a false impression at the time they were made.

222.  Defendants deliberately made the false representations and material omissions to induce Plaintiffs to rely on them.  Plaintiffs reasonably and foreseeably relied on Defendants' omissions and misrepresentations, and as a result entered into the Hudson Agreements, invested large amounts of money in their gas station businesses, and put considerable time and effort into building up the goodwill of the gas station businesses and increasing their value.

223.  Defendants' attempts to terminate the very businesses which their knowing misrepresentations and omissions caused Plaintiffs to spend so much time and money to build up is causing Plaintiffs grievous economic injury of not less than ten million ($10,000,000) dollars.

224.  Wherefore, Plaintiffs demand damages in an amount to be determined at trial but not less than ten million dollars ($10,000.000).

52

## COUNT XI

### Fraud in the Inducement as to Plaintiffs Bhalli and Cranbrook

225.  Plaintiffs Bhalli and Cranbrook incorporate the allegations set forth in Paragraphs 1 through 224 above as though fully set forth herein.

226.  As set forth with more particularity above, in or about the spring of 2015, Plaintiff Bhalli was looking to buy a gas station and saw an ad for a gas station at 64-18 8th Ave., Brooklyn.  The station was advertised as having a 29 year lease.  It was a Hudson property, and the negotiations for Bhalli to take over the leasehold interest was a three-way negotiation among the then lessee, Hudson and Bhalli.

227.  Hudson clearly understood that Bhalli was doing this as a long-term investment and was relying on the advertisement of the 29 year lease.  Although Hudson was aware that the lease was not for 29 years, it omitted to apprise Bhalli of this situation.  On the contrary, Hudson deliberately and knowingly made what it knew to be a false representation to Bhalli that Hudson would be his long-term partner.  When Bhalli questioned why he was then receiving a three-year lease, an agent of Hudson, Victor Iroh, falsely represented to Bhalli that "this is just how we paper these deals."  He assured Bhalli that Hudson would be his partner for the long-term.

228.  Hudson knowingly and deliberately made these false representations and omitted to state material facts concerning the length of the lease in order to induce Bhalli to acquire the leasehold and invest considerable money, time and effort into building up the goodwill of the business to increase its value.  Bhalli reasonably and foreseeably relied on Hudson's misrepresentations and omissions.

229.  In addition, Hudson required that Bhalli pay Hudson a $60,000 deposit for motor fuel.  When Bhalli protested that he could not afford that and could not get a bank loan for the

53

amount on the basis of what was papered as a short-term lease, Hudson knowingly and deliberately made a false representation in writing that they would renew Bhalli's lease.  Hudson made this false written representation with the understanding that Bhalli would take the writing to his bank to get the loan to pay them the $60,000 deposit.  The sole purpose of the false representation was to induce Bhalli to borrow the money and incur debt to pay Defendants a sizeable deposit for motor fuel.

230.  As a result of Hudson's deliberate misrepresentations and omissions of material facts, Bhalli went into considerable debt to acquire what he thought was a 29 year leasehold, pay Hudson a deposit for motor fuel, and make improvements at the station.  He has expended considerable time and money to improve the leasehold in reliance on Hudson's false and misleading representations and omissions.

231.  In further reliance on Hudson's false representations and omissions of material facts, Bhalli caused other persons to invest in the station and transferred the leasehold to Plaintiff Cranbrook, which has other investors in addition to Bhalli.  Hudson was required to approve the assignment to Cranbrook, and in doing so, deliberately omitted to inform Cranbrook that it would not have a long-term lease, but rather continued its false representations of a long-term partnership in order to induce Cranbrook to invest in the station and continue to build up its goodwill and increase its value.  Cranbrook reasonably and foreseeably relied upon Hudson's omissions of material facts and false representations.

232.  Not long after the assignment to Cranbrook, Hudson sent Cranbrook a Nonrenewal Notice, and subsequently instituted foreclosure proceedings.  Both Bhalli and Cranbrook stand to lose all of their investment in their station and all future profits which they expected to receive

54

based on Hudson's false representations and omissions.  In addition, Bhalli will have no means to repay the bank loan which Defendants induced him to enter into for Defendants' own gain.

**233.**  As a result of the fraudulent inducement by Defendants, acting individually and as a single corporate entity, Plaintiffs Bhalli and Cranbrook have been damaged in an amount to be determined at trial, but not less than $750,000, and they hereby make demand therefor.

## COUNT XII
### Fraud as to Plaintiffs Bhalli and Cranbrook

**234.**  Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 224 as though fully set forth herein.

**235.**  In addition, Plaintiffs Bhalli and Cranbrook incorporate the allegations set forth in paragraphs 225 through 233 above as though fully set forth herein.

**236.**  Defendants, acting individually and as a single corporate entity, knew that their representations were false and that their omissions were designed to give a false impression, at the time that such false representations and omissions were made to Plaintiffs Bhalli and Cranbrook.  Defendants made these false representations and omissions of material facts with the express intent that Plaintiffs Bhalli and Cranbrook rely on them.

**237.**  Plaintiffs Bhalli and Cranbrook reasonably and foreseeably did rely on Defendants' false representations and omissions of material facts in acquiring the station leasehold, investing in the station, expending considerable time and money to improve the station and increase its goodwill and thereby its value, and borrowing money to do so.  Both Bhalli and Cranbrook stand to lose all of their investment in their station and all future profits which they expected to receive based on Hudson's false representations and omissions.  In addition, Bhalli will have no means to repay the bank loan which Defendants induced him to enter into.

55

**238.**  As a result of Defendants' fraud, Plaintiffs Bhalli and Cranbrook have been damaged in an amount to be determined at trial, but not less than $750,000, and they hereby make demand therefor.

**COUNT XIII**

**Breach of Contract – Quiet Enjoyment**

**239.**  Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 238 above as though fully set forth herein.

**240.**  Each Plaintiff entered into the Hudson Agreements with Defendants.  Each and all of Plaintiffs' Hudson Agreements are valid, binding and enforceable.

**241.**  The Hudson Agreements specifically required Plaintiffs to pay rent to Defendants on a monthly basis, as well as other obligations.

**242.**  The Hudson Agreements specifically required Defendants to provide Plaintiffs with quiet enjoyment of the premises in which they conduct the operations of their gas station businesses, as well as other obligations.

**243.**  Notwithstanding Plaintiffs' performance of their obligations under the Hudson Agreements, each of the Defendants materially breached the Hudson Agreements by failing to provide Defendants with the quiet enjoyment of the premises in which they operate their respective gas stations.

**244.**  Defendants' actions are in bad faith.  Defendants' actions have been willful, wanton and malicious for the sole purpose of forcing Plaintiffs to abandon their leaseholds.

**245.**  Wherefore, Plaintiffs demand compensatory damages, for all of the above violations and the loss of value with respect to the Hudson Agreements in an amount to be

56

determined at trial but not less than ten million dollars ($10,000,000), as well as punitive

damages, interest, costs and attorney fees.

## COUNT XIV

### Breach of Contract – Failure to Supply Motor Fuel as to
### Plaintiffs SSJ, Sadeen, Cranbrook and A&L

**246.**  Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 245 above as

though fully set forth herein.

**247.**  Defendants, individually and as a single corporate entity, entered into the Hudson

Agreements with Plaintiffs SSJ, Sadeen, Cranbrook, and A&L.  At the end of the term stated in

the Hudson Agreements, such Plaintiffs were wrongfully non-renewed, but nonetheless,

Defendants expressly permitted Plaintiffs to continue to operate pursuant to the Hudson

Agreements.  Therefore, at all times relevant hereto, Plaintiffs SSJ, Sadeen, Cranbrook and

A&L's Hudson Agreements were valid, binding and enforceable.

**248.**  The Hudson Agreements required Plaintiffs SSJ, Sadeen, Cranbrook and A&L to

pay rent to Defendants on a monthly basis as well as other obligations.

**249.**  The Hudson Agreements required Defendants to supply Plaintiffs with motor fuel

for Plaintiffs to sell to the general public as well as other obligations.

**250.**  Notwithstanding Plaintiffs SSJ, Sadeen, Cranbrook and A&L's performance of their

obligations under the Hudson Agreements, and Defendants' acceptance of such performance,

each of the Defendants materially breached the Hudson Agreements by wrongfully failing to

provide Plaintiffs SSJ, Sadeen, Cranbrook and A&L with motor fuel, causing them grievous

economic injury and permanent loss of business.

**251.**  Defendants' willful, wanton, malicious refusal to deliver motor fuel was undertaken in bad faith for the sole purpose of creating economic hardship sufficient to force Plaintiffs to leave their stations.

**252.**  Plaintiffs SSJ, Sadeen, Cranbrook and A&L suffered other damages as a direct consequence of Defendants' wrongful actions, including, without limitation, becoming subject to environmental fines and losing customers for their repair businesses.

**253.**  Wherefore, Plaintiffs SSJ, Sadeen, Cranbrook and A&L seek damages for all of the above breaches and the loss of value of their businesses and consequential damages in an amount to be determined at trial but not less than three million dollars ($3,000,000), plus such punitive damages as the Court deems appropriate for Defendants' willful bad faith breach of contract.

**COUNT XV**

**Breach of Contract – Open Price Term**

**254.**  Plaintiffs incorporated the allegations set forth in Paragraphs 1 through 253 above as though fully set forth herein.

**255.**  The State of New York has adopted, verbatim, the language of the Uniform Commercial Code.

**256.**  UCC § 1–203 imposes an obligation of good faith in the performance of every contract governed by the UCC.  The Hudson Agreements are such contracts.  UCC § 1-203; NY CLS UCC § 1-203.

**257.**  UCC § 2-305, regulating contracts containing open price terms, requires that "a price to be fixed by the seller or the buyer means a price for him to fix in good faith."  UCC § 2-305(2); NY CLS UCC § 2-305(2).

**258.** "Good Faith" is defined as honesty in fact and the observance of reasonable commercial standards of fair dealing.  UCC §§ 1-201 and 2-103; NY CLS §§ 1-201 and 2-103.

**259.** The Hudson Agreements contain an open price term for the sale of gasoline, which requires Defendants to set the price for gasoline under the Hudson Agreements in good faith.

**260.** Defendants have not set the price for gasoline in good faith as evidenced by Defendants consistently pricing gasoline significantly above the market price.  On information and belief, Defendants have priced gas at market at other stations they control in the same neighborhoods as Plaintiffs' stations, and with which Plaintiffs compete.

**261.** Defendants know that by pricing Plaintiffs' gas sales well above market they are preventing Plaintiffs from selling gas, thereby working an unfair hardship on Plaintiffs and preventing Plaintiffs from reaping the full benefits of the Hudson Agreements.

**262.** As a result of Defendants' bad faith conduct, Plaintiffs have been, and continue to be, damaged by the Defendants' actions.

**263.** Wherefore, Plaintiffs seek monetary damages, including consequential damages for the loss of value of their businesses, in an amount to be determined at trial but not less than ten million dollars ($10,000,000.00), plus punitive damages for Defendants' wanton and willful harm to Plaintiffs' businesses, as well as attorney fees, costs and interest in an amount the Court deems appropriate.

## COUNT XVI

### Violations of New York General Business Law § 349

**264.** Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 263 above as though fully set forth herein.

06/12/2017 SL1 1462809v4 111056.00001

265.  Defendants, individually and as a single corporate entity, are engaged in trade or commerce as defined by N.Y. Gen. Bus. L. § 349.

266.  Defendants did not act in good faith in setting the prices for which Plaintiffs must sell gasoline.

267.  Defendants' requiring Plaintiffs to sell gasoline at substantially higher prices than market and at substantially higher prices than neighboring competitors controlled by Defendants constitutes unlawful and/or deceptive acts, as prohibited by the terms of Section 349.

268.  The actions taken by Defendants directly affects New York City in that it resulted in decreased competition within the retail gasoline sales market, increased consumer gasoline prices, and leaves consumers with fewer choices as to where to purchase gasoline.

269.  Plaintiffs have been damaged by Defendants' knowing and willful violation of NY CLS Gen. Bus. §§ 349(a) and (h).

270.  The New York General Business Law provides for reasonable attorney fees and costs to be awarded to a prevailing plaintiff.  NY CLS Gen. Bus. § 349(h).

271.  Wherefore, Plaintiffs seek damages for all of the above violations and the loss of value to Plaintiffs' businesses in an amount to be determined at trial but not less than ten million dollars ($10,000,000.00), plus punitive damages, attorney fees, costs and interest consistent with the statute.

## COUNT XVII

### Breach of Contract - Breach of Implied
### Covenant of Good Faith and Fair Dealing

272.  Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 271 above as though fully set forth herein.

**273.**   Implied in the Hudson Agreements are covenants by all parties not to take actions intended to or that have the effect of depriving the other parties of the benefits of the contracts.

**274.**   By the conduct alleged herein, Defendants have violated the implied covenant of good faith and fair dealing.

**275.**   Plaintiffs have been damaged as a direct result of Defendants' violation of the implied covenant of good faith and fair dealing.

**276.**   Wherefore, Plaintiffs seek damages for the above breaches and consequential loss of value with respect to Plaintiffs' businesses in an amount to be determined at trial but not less than ten million dollars ($10,000,000.00), plus such punitive damages, attorney fees, costs and interest as the court deems appropriate.

## VI.  PRAYER FOR RELIEF

WHEREFORE, on account of the foregoing,

(1) All of the PLAINTIFFS demand hereby:

(a)  In respect of Counts I and II, compensatory damages in an amount to be determined at trial, but not less than ten million ($10,000,000) dollars; plus exemplary damages, attorney fees, expert witness fees and other costs in an amount determined by the Court pursuant to 15 U.S.C. § 2805(d);

(b)  In respect of Counts III, IX and X, compensatory damages in an amount to be determined at trial, but not less than ten million ($10,000,000) dollars;

(c)  In respect of Counts IV, V, VI, compensatory and consequential damages in an attempt to be determined at trial, but not less than ten million ($10,000,000) dollars, plus such punitive damages as determined at trial;

(d)  In respect of Counts XIII, XV, XVI and XVII, compensatory and consequential damages in an amount to be determined at trial, but not less than ten million ($10,000,000) dollars, plus exemplary and punitive damages, witness fees, costs and attorney fees in an amount to be determined at trial;

(e)  In respect of Count III, a declaration and order of this Court that the Non-Renewal Notices are void *ab initio* and have no legal force and effect;

(f)  In respect of Count VII, a declaration and order of this Court that each and every Defendant is equitable estopped from asserting any of the following and from taking any actions in furtherance thereof:

(i)  That Defendants do not have the right to sublease the gas stations which are the subject of the Hudson Leases to Plaintiff for twenty-five years;

(ii)  Defendants are non-renewing the Hudson Agreements effective December 23, 2016;

(iii)  Defendants' commitment to partner with the Plaintiffs and invest in Plaintiffs' stations is not significant or is for a period of time less than twenty-five years; and

(iv)  Defendants are in a business partnership with Plaintiffs for less than twenty-five years.

(g)  In respect of Count VIII, an order of this Court requiring specific performance by Defendants of their clear and unambiguous promises to (1) partner with Plaintiffs for twenty-five years, (2) sublease the gas stations to Plaintiffs for twenty-five years, and (3) invest in improving Plaintiffs' stations for the next twenty-five years; or, in the alternative, the monetary equivalent

thereof in an amount to be determined at trial, but not less than ten million ($10,000,000) dollars; and

      (h)  In respect of all of the above counts, interest at the statutory rate.

(2) Plaintiffs BHALLI and CRANBROOK hereby demand:

      (i)  In respect of Counts XI and XII, compensatory damages in an amount to be determined at trial, but not less than seven hundred fifty thousand ($750,000) dollars; and

      (j)  Interest thereon at the statutory rate.

(3) Plaintiffs SSJ, SADEEN, CRANBROOK and A&L hereby demand:

      (k)  In respect of Count XIV, compensatory and consequential damages in an amount to be determined at trial, but not less than three million ($3,000,000) dollars, plus punitive damages on account of Defendants' bad faith, malicious conduct in an amount to be determined at trial; and

      (l)  Statutory interest thereon.

(4) All PLAINTIFFS request such other, additional relief as this Court may find just and proper.


[Remainder of Page Intentionally Left Blank]

63

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.


Dated:  New York, New York
        June 12, 2017


                                    *s/David H. Hartheimer*
                                    David H. Hartheimer, Esq.

                                    MAYERSON & HARTHEIMER, PLLC
                                    David Hartheimer, Esq.
                                    Sandra E. Mayerson, Esq.
                                            (*pro hac vice* pending)
                                    845 Third Ave., 11th Floor
                                    New York, N.Y.  10022
                                    646-778-4381

                                    *Attorneys for Plaintiffs*


                                    *s/Nicholas F. Kajon*
                                    Nicholas F. Kajon, Esq.

                                    STEVENS & LEE, P.C.
                                    Nicholas F. Kajon, Esq.
                                    485 Madison Avenue
                                    New York, N.Y.  10022
                                    (212) 319-8500

                                    *Attorneys for Plaintiffs*